# Exhibit 3

# MASTER SOFTWARE-AS-A-SERVICE AGREEMENT

*Agreement Reference: MSA-20260507-02*

This Master Software-as-a-Service Agreement **(this "Agreement")** is entered into as of May 7th, 2026 (the "Effective Date") by and between **OneBOSS.io Inc.**, a Texas corporation with its principal place of business at 15911 Champion Dr, Spring, TX 77379 ("OneBOSS"), and ______________________________, a ________________________ with its principal place of business at ________________________________________________________("Customer"). OneBOSS and Customer are each referred to as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, OneBOSS develops, owns, and licenses software-as-a-service applications for the employee health benefits and payroll-data integration markets, including the products marketed as "OneBOSS Census Connect" and "OneBOSS Proposal Engine" (defined herein as "Census Connect" and "Proposal Engine" respectively, and collectively, the "Solutions");

WHEREAS, Customer desires to subscribe to one or more of the Solutions and engage OneBOSS for related professional services on the terms set forth in this Agreement; and

WHEREAS, this Agreement supersedes and replaces in its entirety any prior software-as-a-service agreement, statement of work, amendment, order form, or other contract between the Parties relating to the Solutions that was in effect immediately prior to the Effective Date, all of which are hereby terminated and of no further force or effect, except as expressly preserved in Section 18.2 below.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the Parties agree as follows:

## 1. DEFINITIONS

**"Affiliate"** means with respect to any entity, any other entity that directly or indirectly controls, is controlled by, or is under common control with such entity, where "control" means the ownership of more than fifty percent (50%) of the voting equity interests or the power to direct the management and policies of such entity.

**"Authorized Users"** means Customer's employees, contractors, and agents who are authorized by Customer to access and use the Solutions on Customer's behalf.

**"Census Connect"** means OneBOSS's software-as-a-service application marketed as "OneBOSS Census Connect" that automates the extraction of payroll data from third-party payroll systems and the generation of census files for use in the administration of employee health benefit plans, together with all related APIs, integrations, hosted environments, Documentation, updates, and modifications.

**"Confidential Information"** means non-public information disclosed by one Party (the "Disclosing Party") to the other (the "Receiving Party") that is identified as confidential or that, given the nature of the information or the circumstances of disclosure, a reasonable person would understand to be confidential. Confidential Information includes, without limitation, the terms of this Agreement, business plans, customer lists, technical specifications, source code, pricing, and Customer Data.

**"Customer Data"** means all electronic data, content, and information submitted by or on behalf of Customer to the Solutions, including without limitation employee, payroll, benefits, and tax data, but excluding Aggregated Anonymous Data and OneBOSS Materials.

**"Eligible Client"** means any end-employer client of Customer with respect to which any payroll provider used by such end-employer client is a Supported Payroll Provider. For the avoidance of doubt, an end-employer client of Customer is an Eligible Client if any payroll provider used by such end-employer client (whether for all or any portion of its workforce) is a Supported Payroll Provider, regardless of how many other payroll providers such end-employer client may also use.

**"Documentation"** means the user guides, online help, technical specifications, and similar materials made available by OneBOSS describing the operation and functionality of the Solutions.

**"Order Form"** means a written ordering document executed by the Parties (in paper or electronic form) that identifies the specific Solutions subscribed to by Customer, the applicable Subscription Term, fees, and any other commercial terms.

**"Pre-Existing Conduct"** means any act, omission, agreement, representation, instruction, transaction, or origination, retention, or transfer of data by Customer (or by any predecessor in interest, prior Affiliate, divested business unit, or other entity from which Customer derives rights, obligations, data, or operations) that occurred or originated prior to the Effective Date.

**"Proposal Engine"** means OneBOSS's software-as-a-service application marketed as "OneBOSS Proposal Engine" that calculates employee health benefit plan proposals, including without limitation pre-tax deduction analysis, federal, state, and FICA tax savings calculations, and reimbursement modeling, together with all related APIs, integrations, hosted environments, Documentation, updates, and modifications.

**"Services"** means (a) the hosted Solutions subscriptions provided to Customer pursuant to this Agreement and any Order Form; (b) implementation, integration, configuration, and onboarding services; and (c) the Strategic Consulting Services described in Section 4.

**"Solutions"** means OneBOSS's software-as-a-service products subscribed to by Customer pursuant to this Agreement and any Order Form, including Census Connect and Proposal Engine, in each case as further described in the applicable Order Form, together with any updates, upgrades, modifications, and Documentation.

**"Subscription Term"** means the period during which Customer is authorized to access and use a Solution, as set forth in the applicable Order Form.

**"Supported Payroll Provider"** means any third-party payroll system for which OneBOSS provides Census Connect integration capability (whether by direct API integration, browser-based automation, or other technical means), as listed on OneBOSS's then-current published list of Supported Payroll Providers (updated from time to time as OneBOSS adds or removes integrations).

**"Supported Payroll Provider"** means any third-party payroll system for which OneBOSS provides Census Connect integration capability (whether by direct API integration, browser-based automation, or other technical means), as listed on OneBOSS's then-current published list of Supported Payroll Providers (updated from time to time as OneBOSS adds or removes integrations). As of the Effective Date, the Supported Payroll Providers include without limitation Paychex Flex, QuickBooks, ADP, Gusto, Paylocity, Paycom, Rippling, and iSolved HCM.

**"Third-Party Discovery Demand"** means any third-party subpoena, civil investigative demand, document production request, deposition notice, court order, or governmental investigative demand served upon OneBOSS, in each case to the extent it arises out of or relates to (a) Customer Data, (b) Customer's instructions to OneBOSS, (c) Services provided by OneBOSS to Customer, (d) any dispute or potential dispute to which Customer (or any predecessor or Affiliate of Customer) is or may become a party, or (e) any matter for which Customer has indemnification obligations under this Agreement.

## 2. SOLUTIONS SUBSCRIPTION AND LICENSE GRANT

**2.1 License Grant.** Subject to the terms and conditions of this Agreement, the applicable Order Form, and Customer's timely payment of all Fees, OneBOSS grants Customer a non-exclusive, non-transferable, non-sublicensable, worldwide right during the applicable Subscription Term to access and use the subscribed Solutions, solely for Customer's internal business purposes and solely through its Authorized Users.

**2.2 Restrictions.** Customer shall not, and shall not permit any third party to: (a) reverse engineer, decompile, disassemble, or otherwise attempt to derive the source code, models, or algorithms of the Solutions; (b) modify, translate, or create derivative works of the Solutions; (c) sublicense, resell, lease, rent, or otherwise make the Solutions available to any third party except as expressly permitted herein; (d) use the Solutions to build a competitive product or service; (e) remove or obscure proprietary notices; (f) use the Solutions to process data that does not belong to Customer or that Customer is not authorized to process; or (g) use the Solutions other than in accordance with the Documentation and applicable law.

**2.3 Authorized Users; Credentials.** Customer is responsible for all activity conducted under its Authorized User credentials and for ensuring that its Authorized Users comply with this Agreement. Customer shall not share, transfer, or otherwise make Solution credentials available to any person or

entity other than Customer's own Authorized Users, and shall promptly notify OneBOSS of any unauthorized access or use.

**2.4 Updates.** OneBOSS may, in its sole discretion, modify, update, or discontinue features of the Solutions from time to time, provided that such modifications do not materially diminish the core functionality of any Solution during the then-current Subscription Term.

## 3. IMPLEMENTATION AND CUSTOMER RESPONSIBILITIES

**3.1 Implementation.** OneBOSS will provide reasonable implementation and onboarding assistance, which may include configuration of payroll provider integrations (e.g., Paychex Flex, QuickBooks, ADP, Gusto, Paylocity, Paycom, Rippling, iSolved HCM), tenant setup, and user provisioning, as further described in any mutually agreed Statement of Work or Order Form.

**3.2 Customer Responsibilities.** Customer shall: (a) provide accurate and complete information necessary for OneBOSS to perform the Services; (b) obtain and maintain all third-party authorizations required for OneBOSS to access Customer's payroll provider accounts and other source systems on Customer's behalf; (c) ensure that all Customer Data submitted to the Solutions is owned by Customer or that Customer has all necessary rights and authorizations to submit it; (d) comply with all applicable laws relating to Customer's use of the Solutions and handling of personal information; and (e) designate one or more points of contact for technical and contractual matters.

**3.3 Customer Data Authority.** Customer represents and warrants that it has, and shall maintain throughout the Term, all rights, licenses, consents, and authorizations necessary to (a) submit Customer Data to the Solutions; (b) instruct OneBOSS to access, retrieve, transfer, store, and process Customer Data; and (c) authorize OneBOSS to perform the Services hereunder. Customer shall promptly notify OneBOSS in writing if Customer becomes aware that any Customer Data has been or may have been submitted in error, including without limitation any data that may belong to a third party or that Customer is not authorized to submit.

## 4. STRATEGIC CONSULTING SERVICES

**4.1 Scope.** Upon Customer's request, OneBOSS will provide executive-level strategic consulting services ("Strategic Consulting Services"), which may include solution architecture, integration design, data strategy, regulatory and compliance advisory, M&A and capital markets technical advisory, vendor selection support, and other engagements mutually agreed in writing.

**4.2 Time-and-Materials Billing.** Strategic Consulting Services shall be billed on a time-and-materials basis at the following rates:

- Standard Rate: Eight Hundred Dollars (US$800.00) per hour; or
- Partner Discount Rate: Four Hundred Dollars (US$400.00) per hour, applicable to Customer as a strategic partner of OneBOSS.

Pre-approved travel time and reasonable, documented out-of-pocket expenses (e.g., airfare, lodging, ground transportation, materials) shall be billed at cost and require Customer's prior written approval (which may be by email) for any single expense exceeding US$500.00.

**4.3 Invoicing and Records.** OneBOSS shall invoice Customer monthly for Strategic Consulting Services rendered, with reasonable detail of the personnel, dates, hours, and tasks. Customer shall have ten (10) business days to dispute any invoice line item in writing; failure to dispute within such period shall constitute acceptance.

**4.4 No Required Minimum.** Strategic Consulting Services are provided on an as-requested basis. Customer is not required to engage any minimum hours; however, the Partner Discount Rate is conditioned on Customer's continued status as a paying subscriber to one or more Solutions in good standing.

## 5. FEES, INVOICING, AND PAYMENT

**5.1 Subscription Fees.** Customer shall pay OneBOSS the subscription fees for each Solution, and any per-employee, per-census, per-proposal, or other usage-based charges, as set forth in the applicable Order Form (collectively, the "Subscription Fees"). Unless otherwise specified in an Order Form, Subscription Fees are invoiced monthly in advance and constitute the minimum monthly commitment for the subscribed Solution, regardless of utilization.

**5.2 Consulting Fees.** Strategic Consulting Services are billed in accordance with Section 4.

**5.3 Payment Terms.** All invoices are payable within thirty (30) days of invoice date in U.S. dollars by ACH or wire transfer. Past-due amounts accrue interest at the lesser of one and one-half percent (1.5%) per month or the maximum rate permitted by law, plus reasonable collection costs and attorneys' fees.

**5.4 Suspension.** OneBOSS may suspend access to the Solutions upon ten (10) days' written notice if any undisputed invoice remains unpaid after the due date. Suspension does not relieve Customer of payment obligations.

**5.5 Taxes.** Fees are exclusive of taxes. Customer is responsible for all sales, use, value-added, and similar taxes, excluding taxes on OneBOSS's net income.

**5.6 Eligible Client Billing Principle.** Where any Order Form provides for fees calculated by reference to Customer's broker clients (including without limitation per-client connection fees, per-account fees, or similar metrics), such fees shall apply to each Eligible Client in Customer's book of business during the billing month, regardless of (a) whether such Eligible Client has been onboarded to or integrated with the applicable Solution, (b) whether Customer is actively utilizing the applicable Solution for such Eligible Client, or (c) whether any census files, proposals, or other outputs have been generated for such Eligible Client during the billing month. The Parties acknowledge that this billing principle is intended to (i) compensate OneBOSS for the integration capability OneBOSS makes available to Customer's full Eligible Client book of business, (ii) incentivize Customer's timely onboarding of Eligible Clients, and (iii) protect

OneBOSS from revenue loss arising from Customer's failure to complete onboarding or to actively utilize the Solutions for any particular Eligible Client. Customer alone bears the operational risk of any failure or delay to onboard or utilize the Solutions for Eligible Clients, and no such failure or delay shall reduce, defer, or excuse Customer's payment obligations for Eligible Clients.

**5.7 Disclosure of Eligible Clients; Audit Right.** Customer shall provide OneBOSS, within thirty (30) days of the effective date of any Order Form that uses Eligible-Client billing and within thirty (30) days of any material change, a complete and accurate list of (a) Customer's end-employer clients and (b) the payroll providers used by each. Such list shall constitute the basis for monthly invoicing of Eligible-Client fees and shall be updated by Customer in good faith. OneBOSS may, no more than once per calendar year and with at least thirty (30) days' advance written notice, audit Customer's records (including by review of Customer's broker management or CRM systems, or by sampling Customer's end-client agreements) to verify the accuracy of the disclosed list, in each case subject to reasonable confidentiality restrictions to protect competitively sensitive information of Customer and its end-clients (including, where appropriate, on-site or counsel-only review, redaction of non-relevant fields, or use of an independent third-party auditor under non-disclosure obligations). Any underreporting of Eligible Clients identified in such audit shall be invoiced retroactively for the period since the most recent prior audit (or, if no prior audit has been conducted, for the period since the effective date of the applicable Order Form), together with interest from the date the fee should originally have been invoiced at the rate set forth in Section 5.3. If underreporting in any audited period exceeds five percent (5%) of the count of Eligible Clients reported by Customer, Customer shall additionally bear OneBOSS's reasonable costs of conducting the audit.

## 6. TERM AND TERMINATION

**6.1 Initial Term.** This Agreement commences on the Effective Date and continues for an initial term of twelve (12) months (the "Initial Term"), unless earlier terminated as provided herein. Each Solution subscription has its own Subscription Term as set forth in the applicable Order Form, which runs concurrent with or independent of the Initial Term as specified therein.

**6.2 Renewal.** This Agreement automatically renews for successive twelve-month periods (each a "Renewal Term," and together with the Initial Term, the "Term") unless either Party provides written notice of non-renewal at least sixty (60) days prior to the end of the then-current term.

**6.3 Termination for Cause.** Either Party may terminate this Agreement immediately upon written notice if the other Party (a) commits a material breach that remains uncured for thirty (30) days after written notice (ten (10) days for payment defaults), or (b) becomes insolvent, makes an assignment for the benefit of creditors, or has a bankruptcy proceeding initiated against it that is not dismissed within sixty (60) days.

**6.4 Effect of Termination.** Upon termination: (a) all rights granted to Customer under this Agreement cease; (b) Customer shall pay all undisputed amounts accrued through the effective date of termination;

(c) each Party shall return or destroy the other Party's Confidential Information; and (d) for thirty (30) days following termination, OneBOSS shall make Customer Data available for export in a commercially reasonable format upon Customer's request.

**6.5 Survival.** Sections 1 (Definitions), 7 (Confidentiality), 8 (Intellectual Property), 10 (Representations), 11 (Indemnification), 12 (Limitation of Liability), 13 (Customer Covenants), 16 (Governing Law and Venue), 17 (Notices), and 18 (General Provisions), and any payment obligations accrued prior to termination, shall survive any termination or expiration of this Agreement. Section 5.7 (Disclosure of Eligible Clients; Audit Right) shall survive for two (2) years following termination or expiration, solely for the purpose of permitting OneBOSS to audit billing periods occurring during the Term and to recover any underreported fees.

## 7. CONFIDENTIALITY

**7.1 Obligations.** Each Receiving Party shall (a) use the Disclosing Party's Confidential Information solely to perform its obligations and exercise its rights under this Agreement; (b) protect the Confidential Information using at least the same degree of care it uses to protect its own confidential information of like nature, but in no event less than a reasonable degree of care; and (c) limit disclosure to those of its employees, contractors, and advisors who have a need to know and who are bound by confidentiality obligations no less protective than those herein.

**7.2 Exclusions.** Confidential Information does not include information that (a) is or becomes publicly available through no fault of the Receiving Party; (b) was rightfully known to the Receiving Party without confidentiality obligation prior to disclosure; (c) is rightfully received from a third party not under a confidentiality obligation; or (d) is independently developed without reference to the Disclosing Party's Confidential Information.

**7.3 Compelled Disclosure.** If the Receiving Party is required by law or legal process to disclose Confidential Information, it shall (where legally permitted) provide prompt advance written notice to the Disclosing Party and reasonable cooperation in seeking a protective order. This Section 7.3 is subject to and supplemented by Section 11.5 (Third-Party Discovery).

**7.4 OneBOSS Customer Relationships.** OneBOSS's customer relationships, customer lists, and the existence, terms, or status of OneBOSS's agreements with any other person or entity constitute OneBOSS's Confidential Information. Customer shall not seek, request, infer, or attempt to confirm information regarding OneBOSS's other customer relationships, and OneBOSS is under no obligation to disclose such information.

## 8. INTELLECTUAL PROPERTY

**8.1 OneBOSS IP.** As between the Parties, OneBOSS owns all right, title, and interest in and to the Solutions, OneBOSS Materials, Documentation, Aggregated Anonymous Data, and all intellectual

property rights therein, including without limitation any patents, patent applications (including any provisional, continuation, divisional, or related filings), trademarks, copyrights, and trade secrets. No rights are granted to Customer except as expressly set forth in this Agreement.

**8.2 Customer Data.** As between the Parties, Customer owns all right, title, and interest in and to Customer Data. Customer grants OneBOSS a non-exclusive, worldwide, royalty-free license to host, process, transmit, display, and use Customer Data solely as necessary to provide the Services.

**8.3 Aggregated Anonymous Data.** OneBOSS may collect and use Aggregated Anonymous Data (data that is de-identified and aggregated such that it does not identify Customer or any individual) for any lawful business purpose, including improving the Solutions, benchmarking, and product development.

**8.4 Feedback.** Any suggestions, feedback, or recommendations Customer provides regarding the Solutions are non-confidential, and OneBOSS may use them without restriction or compensation.

## 9. PRIVACY AND DATA SECURITY

**9.1 Security Measures.** OneBOSS shall maintain commercially reasonable administrative, physical, and technical safeguards designed to protect Customer Data against unauthorized access, use, alteration, disclosure, or destruction.

**9.2 Incident Notification.** OneBOSS shall notify Customer without undue delay (and in any event within seventy-two (72) hours) of becoming aware of any confirmed unauthorized access to or acquisition of Customer Data, and shall reasonably cooperate in investigation and remediation.

**9.3 Personal Information.** Customer is responsible for determining the lawful basis for processing personal information through the Solutions and for providing all notices and obtaining all consents required under applicable privacy laws. The Parties shall execute a Data Processing Addendum upon either Party's reasonable request.

**9.4 Multi-Tenant Architecture.** OneBOSS operates a multi-tenant Solutions environment in which each customer's data, configurations, credentials, and access tokens are logically segregated from those of every other customer. OneBOSS does not commingle Customer Data with the data of any other customer and does not provide any other customer with access to Customer Data.

## 10. REPRESENTATIONS AND WARRANTIES

**10.1 Mutual.** Each Party represents and warrants that (a) it is duly organized and validly existing under the laws of its jurisdiction; (b) it has full corporate power and authority to enter into and perform this Agreement; and (c) its execution and performance of this Agreement do not violate any other agreement to which it is a party, including without limitation any separation, transition services, divestiture, settlement, employment, or similar agreement.

**10.2 OneBOSS Performance Warranty.** OneBOSS warrants that the Solutions will perform substantially in accordance with the Documentation under normal use. Customer's exclusive remedy and OneBOSS's sole obligation for breach of this warranty is, at OneBOSS's option, to repair the non-conformity or, if OneBOSS is unable to do so within a reasonable time, to terminate the affected subscription and refund prepaid, unused fees.

**10.3 Customer Warranties.** Customer represents, warrants, and covenants that:

- (a) Customer owns or has all necessary rights, licenses, consents, and authorizations to all Customer Data and to instruct OneBOSS to access Customer's third-party payroll, HR, and benefits systems;
- (b) all Customer Data submitted to the Solutions is owned by Customer or lawfully retained or transferred to Customer, does not belong to any third party who has not authorized its submission, and may be lawfully processed by OneBOSS hereunder;
- (c) Customer's use of the Solutions will comply with all applicable laws, including without limitation laws relating to employment, privacy, and the protection of personal information;
- (d) Customer's execution and performance of this Agreement do not breach any agreement, settlement, judgment, separation agreement, transition services agreement, divestiture agreement, employment agreement, or court order to which Customer is or has been subject;
- (e) Customer is not relying on any representation or warranty by OneBOSS as to the legal effect of any prior corporate transaction, separation, divestiture, restructuring, or similar event involving Customer or any predecessor of Customer; and
- (f) the Solutions and Services are licensed and provided by OneBOSS solely to Customer for Customer's internal business purposes, and Customer has not made and will not make any representation to any third party that OneBOSS has endorsed, validated, or approved any aspect of Customer's business or its disputes or relationships with any third party.

**10.4 Disclaimer.** EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, ONEBOSS PROVIDES THE SOLUTIONS AND SERVICES "AS IS" AND DISCLAIMS ALL OTHER WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING WITHOUT LIMITATION IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. ONEBOSS DOES NOT WARRANT THAT THE SOLUTIONS WILL BE UNINTERRUPTED OR ERROR-FREE.

## 11. INDEMNIFICATION

**11.1 Indemnification by Customer — General.** Customer shall defend, indemnify, and hold harmless OneBOSS and its Affiliates, officers, directors, employees, agents, and successors (collectively, the "OneBOSS Indemnitees") from and against any and all third-party claims, demands, suits, actions, proceedings, losses, damages, liabilities, settlements, judgments, fines, penalties, costs, and expenses (including reasonable attorneys' fees and expert witness fees) (collectively, "Losses") arising out of or relating to:

- (a) Customer Data, including any allegation that Customer Data infringes, misappropriates, or violates the rights of any third party (including any rights of ownership, privacy, confidentiality, or contract);
- (b) Customer's breach of any representation, warranty, or covenant in this Agreement;
- (c) Customer's use of the Solutions in violation of this Agreement, the Documentation, or applicable law;
- (d) Customer's instructions to OneBOSS, including instructions to access, retrieve, transfer, or process particular data sets or to integrate with particular third-party systems;
- (e) Pre-Existing Conduct of Customer or any predecessor in interest, prior Affiliate, divested business unit, or other entity from which Customer derives rights, obligations, data, or operations; and
- (f) any breach by Customer of any separation agreement, transition services agreement, divestiture agreement, settlement, employment agreement, or other contract, judgment, or court order to which Customer is or has been subject.

**11.2 Indemnification by Customer — Third-Party and Affiliated-Party Claims.** Without limiting Section 11.1, Customer shall additionally defend, indemnify, and hold harmless the OneBOSS Indemnitees from and against any and all Losses arising out of or relating to any claim, demand, action, suit, proceeding, subpoena, discovery request, investigation, or assertion of liability brought, served, or asserted against OneBOSS, in any forum, by or on behalf of:

- (a) any current or former Affiliate of Customer (including any parent, subsidiary, or sister entity, whether currently affiliated or formerly affiliated with Customer);
- (b) any predecessor in interest, successor, or assign of Customer, or any divested business unit or formerly affiliated entity of Customer;
- (c) any party to a corporate separation, transition services, divestiture, restructuring, settlement, employment, joint venture, or other agreement to which Customer (or any predecessor or Affiliate of Customer) is or was a party; or
- (d) any other person or entity claiming an interest in Customer Data, in any aspect of Customer's business, or in any rights, obligations, or operations of Customer or of any predecessor of Customer,

  in each case to the extent the claim arises out of or relates to (i) Services provided by OneBOSS to Customer; (ii) Customer Data or Customer's instructions to OneBOSS; (iii) Pre-Existing Conduct of Customer; or (iv) any matter for which Customer is obligated to indemnify OneBOSS under Section 11.1. This indemnification obligation applies regardless of (x) the legal theory under which the claim is asserted (including contract, tort, statute, or equity); (y) whether OneBOSS is named as a direct party or as a third party; or (z) the merits of the claim. The Parties acknowledge that this Section 11.2 is a material inducement to OneBOSS entering into this Agreement.

**11.3 Indemnification by OneBOSS — IP Infringement.** OneBOSS shall defend, indemnify, and hold harmless Customer and its Affiliates, officers, directors, and employees from and against Losses arising out of any third-party claim alleging that the Solutions, as provided by OneBOSS and used in accordance with this Agreement and the Documentation, infringe any U.S. patent, copyright, or trademark, or misappropriate any trade secret. This obligation does not apply to Losses arising from: (a) Customer Data; (b) modifications to the Solutions not made by OneBOSS; (c) combinations of the Solutions with products, data, or services not provided by OneBOSS where the infringement would not occur but for such combination; (d) Customer's use of the Solutions in violation of this Agreement; or (e) any version of a Solution other than the most recent version made available by OneBOSS, where use of the most recent version would have avoided the alleged infringement. If a Solution becomes, or in OneBOSS's opinion is likely to become, the subject of an infringement claim, OneBOSS may, at its option and expense, (i) procure for Customer the right to continue using the Solution; (ii) modify the Solution to be non-infringing while preserving substantially equivalent functionality; or (iii) terminate the affected subscription and refund prepaid, unused fees. THIS SECTION 11.3 STATES ONEBOSS'S SOLE AND EXCLUSIVE LIABILITY, AND CUSTOMER'S EXCLUSIVE REMEDY, FOR ANY ALLEGED INFRINGEMENT.

**11.4 Procedure.** The Party seeking indemnification (the "Indemnitee") shall (a) promptly notify the indemnifying Party (the "Indemnitor") of the claim in writing (provided that failure to give prompt notice shall not relieve the Indemnitor of its obligations except to the extent the Indemnitor is materially prejudiced thereby); (b) grant the Indemnitor sole control of the defense and settlement of the claim, provided that the Indemnitor shall not settle any claim that imposes any non-monetary obligation, admission of liability, or injunctive relief on the Indemnitee without the Indemnitee's prior written consent (not to be unreasonably withheld); and (c) reasonably cooperate, at the Indemnitor's expense, in the defense of the claim. The Indemnitee may participate in the defense at its own expense with counsel of its choice.

**11.5 Third-Party Discovery.** Customer shall reimburse OneBOSS, within thirty (30) days of invoice, for all reasonable costs and expenses incurred by OneBOSS in responding to or complying with any Third-Party Discovery Demand, including without limitation outside counsel fees, internal personnel time billed at the Standard Rate set forth in Section 4.2 (or, if applicable to internal counsel and senior leadership, at then-prevailing reasonable rates), document collection and review costs, e-discovery vendor costs, expert costs, deposition preparation and appearance time, and travel expenses. The foregoing applies regardless of whether OneBOSS is named as a party in the underlying matter and is in addition to, and not in lieu of, the indemnification obligations in Sections 11.1 and 11.2. Where reasonably practicable and not legally prohibited, OneBOSS shall provide Customer with prompt notice of any Third-Party Discovery Demand and reasonable opportunity to participate at Customer's expense in OneBOSS's response.

**11.6 No Limitation.** Customer's indemnification obligations under Sections 11.1, 11.2, and 11.5 are not subject to the limitation of liability set forth in Section 12, and Customer expressly waives any defense

based on contributory or comparative negligence with respect to such obligations to the maximum extent permitted by law (other than where Losses arise from OneBOSS's gross negligence, willful misconduct, or fraud).

**11.7 Survival.** The indemnification obligations of this Section 11 survive termination or expiration of this Agreement indefinitely, except that claims under Section 11.3 (OneBOSS IP Indemnity) survive for two (2) years after termination.

## 12. LIMITATION OF LIABILITY

**12.1 Exclusion of Damages.** EXCEPT FOR LOSSES SUBJECT TO INDEMNIFICATION UNDER SECTION 11, BREACHES OF SECTIONS 2.2 (RESTRICTIONS), 7 (CONFIDENTIALITY), OR 8 (INTELLECTUAL PROPERTY), CUSTOMER'S PAYMENT OBLIGATIONS, OR EITHER PARTY'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT, OR FRAUD, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS, LOST REVENUE, OR LOSS OF GOODWILL, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**12.2 Cap.** EXCEPT FOR THE EXCLUDED MATTERS LISTED IN SECTION 12.1, EACH PARTY'S AGGREGATE LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED THE GREATER OF (A) THE FEES PAID BY CUSTOMER TO ONEBOSS IN THE TWELVE (12) MONTHS PRECEDING THE EVENT GIVING RISE TO LIABILITY, OR (B) ONE HUNDRED THOUSAND U.S. DOLLARS (US$100,000).

**12.3 Acknowledgment.** The Parties acknowledge that the limitations and exclusions in this Section 12 are a fundamental basis of the bargain between them and reflect an allocation of risk that is reasonable in light of the Fees payable hereunder.

## 13. CUSTOMER COVENANTS

**13.1 Independent Customer Status.** Customer is one of multiple customers of OneBOSS. Customer's relationship with OneBOSS is independent of OneBOSS's relationships with all other customers. Customer is not jointly or severally liable for any obligation of any other customer of OneBOSS, and Customer disclaims any right, license, claim, or interest in or under any other customer's agreement with OneBOSS.

**13.2 No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the Parties and their permitted successors and assigns. No third party (including without limitation any current or former Affiliate, predecessor, successor, divested entity, or counterparty of Customer) is, or shall be deemed to be, a third-party beneficiary of this Agreement, and no third party shall have any right to enforce any provision hereof.

**13.3 Non-Disparagement.** Customer shall not make any false or materially misleading public statement about OneBOSS, the Solutions, or OneBOSS's services, in any context (including in any dispute, public

communication, marketing communication, or proceeding involving any third party). Nothing in this Section 13.3 limits Customer's ability to (a) make truthful statements required by law or legal process, (b) comply with regulatory disclosure requirements, or (c) communicate truthful, factual information to its own legal counsel, auditors, or financial advisors under obligations of confidentiality.

**13.4 No Use of OneBOSS in Disputes.** Customer shall not represent, assert, or imply in any dispute, negotiation, marketing material, or public communication involving any third party that OneBOSS has endorsed, validated, or taken any position with respect to (a) Customer's business, products, or services; (b) any dispute between Customer and any third party; or (c) the allocation of any rights, data, employees, or obligations between Customer and any third party.

## 14. INSURANCE

Each Party shall maintain, at its own expense, customary insurance coverage appropriate to its business, including commercial general liability, professional liability/errors and omissions, and cyber liability coverage. Each Party shall provide certificates of insurance upon the other Party's reasonable written request.

## 15. FORCE MAJEURE

Neither Party shall be liable for any failure or delay in performance (excluding payment obligations) caused by events beyond its reasonable control, including acts of God, war, terrorism, civil unrest, pandemic, governmental action, labor disputes, internet or telecommunications failures, or third-party cloud service outages, provided the affected Party gives prompt notice and uses reasonable efforts to resume performance.

## 16. GOVERNING LAW AND VENUE

**16.1 Governing Law.** This Agreement is governed by and construed in accordance with the laws of the State of Texas, without giving effect to its conflict-of-laws principles.

**16.2 Venue.** The Parties consent to the exclusive jurisdiction and venue of the state and federal courts located in Harris County, Texas for any action arising out of or relating to this Agreement, and waive any objection based on inconvenient forum.

**16.3 Jury Trial Waiver.** EACH PARTY KNOWINGLY, VOLUNTARILY, AND IRREVOCABLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT.

**16.4 Equitable Relief.** Each Party acknowledges that breach of Sections 2.2, 7, or 8 may cause irreparable harm for which monetary damages are inadequate, and that the non-breaching Party may seek injunctive or other equitable relief without posting bond, in addition to any other remedies available.

## 17. NOTICES

All notices under this Agreement shall be in writing and delivered by (a) hand delivery, (b) nationally recognized overnight courier with tracking, or (c) certified U.S. mail, return receipt requested, to the addresses set forth in the preamble (or such other address as either Party may designate in writing). Routine operational notices may be sent by email to the contacts designated by each Party. Legal notices, including notices of breach, termination, indemnification claims, and Third-Party Discovery Demands, shall additionally be sent by overnight courier or certified mail.

## 18. GENERAL PROVISIONS

**18.1 Entire Agreement.** This Agreement (including any Order Forms and Statements of Work executed hereunder) constitutes the entire agreement between the Parties regarding its subject matter and supersedes all prior or contemporaneous agreements, proposals, communications, and understandings, whether oral or written, all of which are terminated and replaced as of the Effective Date.

**18.2 Preservation of Accrued Rights.** Notwithstanding the supersession in Section 18.1, (a) all amounts owed to OneBOSS for services rendered prior to the Effective Date under any prior agreement between the Parties remain due and payable in accordance with their original terms, and nothing in this Agreement shall waive, release, or compromise any such pre-existing obligation; and (b) any indemnification, confidentiality, or intellectual property obligation that, by its terms, was intended to survive termination of any superseded agreement remains in full force and effect to the extent more protective of OneBOSS than the corresponding provision in this Agreement.

**18.3 Amendment.** No amendment or modification to this Agreement is effective unless in writing and signed by an authorized representative of each Party.

**18.4 Assignment.** Customer may not assign this Agreement, in whole or in part, without OneBOSS's prior written consent, including by operation of law or in connection with any merger, acquisition, change of control, or sale of all or substantially all of Customer's assets, and any attempted assignment in violation of this Section is void. OneBOSS may assign this Agreement without consent in connection with a merger, acquisition, financing, or sale of all or substantially all of its assets. This Agreement binds and inures to the benefit of the Parties and their permitted successors and assigns.

**18.5 Severability.** If any provision of this Agreement is held invalid or unenforceable, the remaining provisions remain in full force and effect, and the invalid provision shall be modified to the minimum extent necessary to render it enforceable while preserving the Parties' original intent.

**18.6 Waiver.** No waiver of any provision is effective unless in writing and signed by the waiving Party. No failure or delay in exercising any right constitutes a waiver of that right.

**18.7 Independent Contractors.** The Parties are independent contractors. Nothing in this Agreement creates a partnership, joint venture, agency, fiduciary, or employment relationship.

**18.8 Counterparts; Electronic Signatures.** This Agreement may be executed in counterparts, each of which is an original and all of which together constitute one instrument. Electronic signatures (including via DocuSign or similar service) and PDF copies have the same effect as originals.

## SIGNATURES

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

| | |
|---|---|
| **OneBOSS.io Inc.** | ______________________________ |
| Stephen Myers<br>Stephen Myers (Jun 8, 2026 15:59:01 CDT) | ______________________________ |
| By: | By: |
| Name: Stephen Myers | Name: ______________________________ |
| Title: Founder and Chief Executive Officer | Title: ______________________________ |
| Date: 06/08/2026 | Date: ______________________________ |

# ORDER FORM

*Order Form No. O-20260507-002*

*OneBOSS.io Inc. — Master SaaS Agreement*

This Order Form **(this "Order Form")** is entered into as of May 7th, 2026 (the "Order Form Effective Date") by and between **OneBOSS.io Inc.** ("OneBOSS") and ______________________________ ("Customer"), pursuant to the Master Software-as-a-Service Agreement between OneBOSS and Customer dated [MSA EXECUTION DATE] (the "MSA").

Capitalized terms used but not defined in this Order Form have the meanings given in the MSA. In the event of any conflict between this Order Form and the MSA, this Order Form controls solely with respect to the commercial terms expressly set forth herein; the MSA controls in all other respects.

## 1. Solutions Subscribed

Customer subscribes to the Solutions marked with an "X" below for the Subscription Term set forth in Section 2.

| Select | Solution | Description |
|---|---|---|
| [ X ] | **OneBOSS Census Connect** | Automated payroll data extraction and EHP census file generation across supported payroll providers. |
| [ X ] | **OneBOSS Proposal Engine** | Native EHP proposal calculation including Section 125 pre-tax deduction analysis, federal/state/FICA tax savings calculations, SIMERP reimbursement modeling, and proposal export. |

*(Mark "X" for selected Solutions; mark with a strike-through or "—" for un-selected. Customer may add additional Solutions at any time by executing a subsequent Order Form.)*

## 2. Subscription Term

| | |
|---|---|
| **Subscription Start Date** | May 15th, 2026 |
| **Initial Subscription Term** | Twelve (12) months from the Subscription Start Date |
| **Renewal** | Auto-renewing for successive twelve (12) month Renewal Terms unless either Party provides written notice of non-renewal at least sixty (60) days prior to the end of the then-current term, as set forth in MSA Section 6.2. |

## 3. Fees

All amounts are in U.S. dollars and exclusive of taxes. Recurring fees are invoiced monthly in advance. Usage-based fees are invoiced monthly in arrears.

### 3.1 OneBOSS Census Connect Fees

Census Connect is priced on a hybrid model consisting of a Monthly Platform Minimum, a per-Eligible-Client connection fee, and a per-employee-per-month fee. Capitalized terms used in this Section 3.1 (including without limitation "Eligible Client" and "Supported Payroll Provider") have the meanings given in the Master SaaS Agreement. The Per-Client Connection Fee is calculated in accordance with MSA Section 5.6 (Eligible Client Billing Principle); Customer's disclosure obligations and OneBOSS's audit rights with respect to Eligible Clients are governed by MSA Section 5.7. Customer's monthly Census Connect fee shall be the greater of (a) the Monthly Platform Minimum, or (b) the sum of the Per-Client Connection Fees and Per-Employee-Per-Month (PEPM) Fees calculated as set forth below. The Monthly Platform Minimum is invoiced monthly in advance; usage-based amounts in excess of the Monthly Platform Minimum are invoiced monthly in arrears upon measurement.

| Fee Component | Standard Rate | Basis |
|---|---|---|
| **Monthly Platform Minimum** | **US$25,000.00** | Minimum monthly commitment for Census Connect access, regardless of utilization. Establishes the revenue floor; usage-based fees apply only to the extent they exceed this amount in a given month. |
| **Per-Client Connection Fee** | **US$75.00** | Per Eligible Client per month, calculated in accordance with MSA Section 5.6 (Eligible Client Billing Principle), regardless of onboarding or utilization status. |
| **Per-Employee-Per-Month (PEPM) Fee** | **US$0.75** | Per employee record processed per month, measured as the aggregate count of unique employee records included in census files generated during the billing month. The PEPM Fee is a usage-based fee and applies only to actual processed records; it does not apply to employees of Eligible Clients who have not been onboarded. |
| Implementation Fee (one-time) | US$0 | One-time onboarding fee, if any, invoiced upon execution. Mark "$0" or strike-through if waived. |

**3.1.1 Worked Example.** For illustration only: if Customer has 100 Eligible Clients (whether or not onboarded to Census Connect) and processes 5,000 employee records during a given month, fees would be (100 × $75) + (5,000 × $0.75) = $7,500 + $3,750 = $11,250. Because this is below the Monthly Platform Minimum of $25,000, Customer's Census Connect fee for that month is $25,000. If Customer has 250 Eligible Clients and processes 15,000 employee records, fees would be (250 × $75) + (15,000 × $0.75) = $18,750 + $11,250 = $30,000. Because

this exceeds the Monthly Platform Minimum, Customer's Census Connect fee for that month is $30,000. In each example, the Per-Client Connection Fee is calculated against the total count of Eligible Clients in Customer's book of business — including Eligible Clients whom Customer has not yet onboarded — while the PEPM Fee is calculated only against actual processed employee records.

*(The Standard Rates above are derived from OneBOSS's baseline Census Connect pricing structure. Customer-specific adjustments — alternative platform minimum, volume tier discounts, alternative per-Eligible-Client or PEPM rates, or modified disclosure cadence — may be set forth in Section 3.4 below.)*

### 3.2 OneBOSS Proposal Engine Fees

Proposal Engine is priced as a flat monthly fee with a tiered pricing schedule for the first twenty-four months, transitioning to OneBOSS's then-current market rate for Proposal Engine from month twenty-five onward. The Introductory Rate is conditioned upon Customer's use of the Proposal Engine as Customer's primary proposal generation system; if Customer maintains a parallel third-party proposal generation system during the Introductory Period, OneBOSS reserves the right to apply the Post-Introductory Rate.

For purposes of this Section 3.2, OneBOSS's market rate for Proposal Engine as of the Subscription Start Date is Thirty Thousand U.S. Dollars (US$30,000.00) per month (the "Market Rate at Signing"). The Introductory Rate and Post-Introductory Rate are expressed as discounts from the Market Rate at Signing.

| Period | Monthly Fee | Description |
|---|---|---|
| **Introductory Rate (Months 1–12)** | **US$15,000.00** | Fifty percent (50%) discount from the Market Rate at Signing, applicable to the first twelve (12) months of the Subscription Term |
| **Post-Introductory Rate (Months 13–24)** | **US$22,500.00** | Twenty-five percent (25%) discount from the Market Rate at Signing, applicable to months 13–24 of the Subscription Term |
| **Market Rate (Month 25 onward)** | **OneBOSS's then-current market rate** | OneBOSS's then-current published market rate for Proposal Engine as of the start of month 25, subject to Section 3.2.1 |
| Implementation Fee (one-time) | US$0 | One-time onboarding fee, if any, invoiced upon execution. Mark "$0" or strike-through if waived. |

**3.2.1 Rate from Month 25 Onward.** Commencing on month 25 of the Subscription Term, the Proposal Engine fee shall be OneBOSS's then-current published market rate for Proposal Engine. OneBOSS shall provide Customer with written notice of the applicable rate at least sixty (60) days prior to the start of month 25. At or before the end of the twenty-fourth (24th) month following the Subscription Start Date, the Parties may negotiate in good faith regarding alternative pricing structures (including without limitation volume-tier, per-proposal, or fixed-rate alternatives); any such alternative is effective only upon written agreement signed by both Parties prior to month 25. Customer acknowledges that the transition from the Post-Introductory Rate to the rate from month 25

onward represents a contractually agreed transition from introductory pricing to market pricing and is not an annual fee adjustment subject to the cap in Section 3.5; subsequent annual adjustments to the rate from month 25 onward are governed by Section 3.5.

**3.2.2 Accuracy Disclaimer.** Proposal Engine output is generated algorithmically from Customer Data. OneBOSS warrants the computational integrity of the engine in accordance with MSA Section 10.2 but does not warrant the accuracy of underlying Customer Data or the suitability of any proposal for any particular prospective end-client. Customer is solely responsible for reviewing, verifying, and approving all proposal outputs prior to transmittal to any third party.

### 3.3 Strategic Consulting Services

Strategic Consulting Services are billed on a time-and-materials basis at the rates set forth in MSA Section 4.2:

| Rate | Amount | Applicable to |
|---|---|---|
| **Standard Rate** | US$800.00 / hour | Default rate |
| **Partner Discount Rate** | US$400.00 / hour | Strategic partners in good standing |

**Customer's applicable rate:** ☐ Standard ($800/hr) ☐ Partner Discount ($400/hr)

### 3.4 Volume / Tier Discounts and Commitments (if any)

*[Describe any volume discounts, tier-based pricing, annual prepayment discounts, or minimum commitments. If none, mark "Not applicable."]*

________________________________________________________________

________________________________________________________________

________________________________________________________________

### 3.5 Annual Fee Adjustment

OneBOSS may adjust the recurring fees set forth above no more than once per twelve-month period, effective at the start of any Renewal Term, by providing at least sixty (60) days' written notice to Customer. Annual increases shall not exceed the greater of (a) five percent (5%) or (b) the percentage change in the U.S. Consumer Price Index (All Urban Consumers, U.S. City Average) over the prior twelve months.

## 4. Payment Terms

Payment terms are governed by MSA Section 5.3 (Net 30, ACH or wire transfer). Any deviation is set forth below; otherwise, MSA Section 5.3 applies.

☐ Standard (Net 30, as per MSA) ☐ Alternative: __________________________

## 5. Special Commercial Terms (if any)

*[Describe any customer-specific commercial terms — e.g., proof-of-concept periods, pilot pricing, conversion-from-pilot terms, marketing co-op, training credits, dedicated support tiers, SLA enhancements. If none, mark "Not applicable." Special terms must not modify the legal terms in the MSA; any such modification requires a written amendment to the MSA.]*

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

## 6. Incorporation; Effect

This Order Form is incorporated into and made a part of the MSA. The Parties' rights and obligations with respect to the Solutions and Services described herein are governed by the MSA except to the extent expressly modified by this Order Form for the specific commercial terms set forth herein. Execution of this Order Form does not modify or waive any provision of the MSA.

## SIGNATURES

IN WITNESS WHEREOF, the Parties have caused this Order Form to be executed by their duly authorized representatives as of the Order Form Effective Date.

| **OneBOSS.io Inc.** | ______________________________ |
|---|---|
| Stephen Myers<br>Stephen Myers (Jun 8, 2026 15:59:01 CDT)<br>By: | ______________________________<br>By: |
| Name: Stephen Myers | Name: ______________________ |
| Title: Founder and Chief Executive Officer | Title: ______________________ |
| Date: 06/08/2026 | Date: ______________________ |